## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **WELLS** | **CIVIL ACTION** |
| **VERSUS** | **NO.  13-6510** |
| **ENTERPRISE MARINE SERVICES, LLC et al** | **SECTION: "G"(1)** |

### ORDER

Before the Court is Plaintiff Lazaries Wells's ("Plaintiff") "Motion to Exclude Report and Testimony of Brobston Lutz, MD,"[1] filed on August 29, 2014. Defendants Enterprise Marine Services, L.L.C. and Enterprise Products Company (collectively, "Defendants") oppose the motion.[2] Having considered the motion, the response, the record, and the applicable law, the Court will **DENY** the motion.

### I. Dr. Lutz's Report

At Defendants' request, Dr. Lutz conducted an Independent Medical Evaluation (IME) on Plaintiff on March 18, 2014.[3]  Dr. Lutz then produced a report expressing five separate opinions as follows:

I.     Mr. Wells' reported symptoms exceeded what would be expected given his history, his original diagnosis, and the treatment he received. His ongoing back pain cannot be explained by his reported injury.

II.      Mr. Wells has chronic low back pain secondary to longstanding spinal degenerative disc disease and morbid obesity. His degenerative disc disease predated his reported injury in February 2011.

---

[1] Rec. Doc. 12.

[2] Rec. Doc. 13.

[3] Rec. Doc.12-2 at p. 2.

1

III.    He may have exacerbated his underlying back problem while working in February 2011, but any such exacerbation would not have lasted longer than two to three months.

IV.    His underlying back complaints are driven by his underlying degenerative disc disease compounded by psychological factors demonstrated by low effort, inconsistent behavior, and specific pain statements not consistent with observed movement patterns.

V.    I agree with the deposition testimony from two of his treating physicians. If Mr. Wells loses weight, keeps his blood pressure under control and cooperates appropriately, a new Functional Capacity Evaluation would be more reflective of his true underlying work abilities.[4]

The report then delineates the following "Reasons for my opinions and additional observations":

1.    Mr. Wells has classic degenerative disc disease manifested by chronic low intensity back pain that did not respond to epidural injections and extensive physical therapy.

2.    His discomfort is eased by pain medications. His accelerated spinal disc degeneration is greatly accelerated because of his massive obesity. Obesity is an independent risk factor for premature multi-segmental spinal disc deterioration. Excess weight causes physical loading on the disc leading to a chronic low-grade inflammation that fuels disc degeneration. Spinal disc degeneration happens at an earlier age and is much more common with obesity.

3.    His MRI demonstrated classic arthritic changes in the facet joints of the posterior aspect his spine. His imaging findings are unrelated to any work injury and similar to what would be observed in a cross section of other men his age and weight.

4.    Raising either straight leg caused him to complain of back pain on the contralateral side. His alleged discomfort seemed rehearsed as the discomfort was equal when raising each leg, there was no pain radiation below either knee, and he did not complain of any discomfort when I extended his knee with him in the sitting position which would also have stretched his sciatic nerve.

5.    Presently, his low back pain is often debilitating and can limit function, impact psychological wellbeing, diminish overall quality of life, and is associated with substantial socioeconomic and health-care costs.

6.    Unfortunately anatomical changes in the spine associated with obesity are rarely reversible. Weight reduction often helps reduce discomfort but obese patients rarely have optimal responses to physical therapy, chiropractic manipulation, and epidural steroids. Surgery also is rarely helpful in patients with his history and findings. In fact, surgery in such patients often makes things worse and rarely results in any improvement.

---

[4] Rec. Doc. 12-1.

7.      In spite of "poor effort", a Physical Work Performance Evaluation cleared him for light duty work with lifting 20 pounds occasionally and 10 pounds frequently on November 14, 2011. The examiner noted significant evidence of low effort and inconsistent behavior. His specific pain statements were not consistent with the observed movement patterns. He has a high self-limiting score consistent with psychosocial and/or emotional factors affecting testing results.

8.      Dr. Kalston in late November 2011 opined that Mr. Wells has a 7% whole person impairment based on AMA guidelines. I agree with this assessment.

9.      Mr. Wells saw an internist at the Gwinnett Clinic in December 2011 who apparently opined that his chronic back pain was mostly weight related and that a cross section of the population would have the same MRI findings unrelated to any work injuries. I agree with this assessment.

10.     It is well known that a certain sub-set of individuals on workmans compensation have persistent subjective complaints and fail "to improve" regardless of treatment. The longer they delay returning to work, the less likely they are to ever return to meaningful employment.

11.     Review of his medical records show various degrees of blood pressure control from normal to elevated mostly reflecting whatever antihypertensive regimen he was taking at each reading. His blood pressure can be easily controlled with or without weight loss with readily available medications. This control would be much easier if he lost weight; however, if he takes properly prescribed medications, his hypertension will be controlled and will not cause any employment restrictions.[5]

## II. Parties' Arguments

### A.      Plaintiff's Arguments in Support of his Motion to Exclude

Plaintiff contends that the four-page report produced by Dr. Lutz on August 22, 2014 contains opinions that "are, for the most part, orthopedic in nature and concern causation aspects of this case."[6]  Plaintiff argues first that Dr. Lutz's expert report makes conclusions outside of his field of expertise because "Opinions I-IV clearly express opinions which are those usually expressed by

---

[5] *Id.*

[6] *Id.*

orthopedic experts, which Dr. Lutz clearly is not."[7] With respect to the portion of the report titled "Reasons for my opinions and additional observations," Plaintiff argues that:

> Reasons 1-6 are clearly orthopedic in nature. Number 7 simply repeats the results of the FCE - again cumulative and not expressive of any independent opinion. Numbers 8 and 9 repeat the opinions of other physicians and state that he agrees with them - cumulative and outside the ambit of his expertise. Reason number 10 even goes further in that it seems to express opinions regarding secondary gain in workers [sic] compensation cases. This opinion is psychological in nature and beyond Dr. Lutz's areas of expertise. Reason number 11, like opinion V, concerns Wells [sic] blood pressure and is the one opinion given by Dr. Lutz that is squarely within his expertise.[8]

Plaintiffs additionally aver that because Dr. Lutz, "although eminently qualified in certain fields of medicine," is not qualified as either an orthopedist, neurologist, or as a surgeon in either of those specialized fields, his opinion on such conditions would not assist the trier of fact in the determination of this case.[9]  Accordingly, Plaintiff urges the Court to "exclude the opinions and testimony of Dr. Brobston Lutz concerning anything other than Wells' blood pressure as there has been no demonstration of the required expertise in the field of orthopedics."[10]

## B.    *Defendants' Arguments in Opposition*

Defendants first argue that Dr. Lutz's findings survive *Daubert* scrutiny because Dr. Lutz based his opinions on both his in-person evaluation of Plaintiff and a review of records from Plaintiff's other treating physicians.[11] With respect to Dr. Lutz's "Reasons for my opinions and

---

[7] *Id.* at p. 5.

[8] *Id.* at pp. 5-6.

[9] Rec. Doc. 12-1 at p. 1.

[10] *Id.* at p. 8.

[11] Rec. Doc. 13 at p. 6.

additional observations," Defendants argue that finding number one "is a concurrence (peer review and acceptance) after a review of objective film studies. As a general practitioner who sees patients complaining of musculoskeletal injuries, Dr. Lutz is certainly qualified to review film studies and consider diagnoses of Plaintiff's previous treating physicians."[12] Findings two, three, four, and five, Defendants argue, involve evaluating prior medical records and Plaintiff's complaints made to Dr. Lutz at the IME, and are Dr. Lutz's own knowledge and experience as a general practitioner regarding the implications of obesity on Plaintiff's condition.[13] According to Defendants, finding number six involves "Waddells Testing," which are a set of tests that have been peer reviewed and accepted by the medical community in order to determine whether a patient is lying about his pain or condition.[14] Defendants aver that Dr. Lutz regularly utilizes this type of testing in performing IMEs.[15] Finding number seven, according to Defendants, discusses general medical knowledge certainly within the knowledge of an internal medicine/general practitioner.[16] Finding eight and nine "involve a review of Plaintiff's [Functional Capacity Evaluation] and represents a medical concurrence by Dr. Lutz of the administering physician's diagnosis. Nevertheless, this demonstrates peer-review, objectivity and general acceptance of the methodology in the medical community in accordance with *Daubert*."[17] Defendants argue that finding number ten falls within *Daubert* because it is an observation that Dr. Lutz has made throughout the course of more than thirty years of

---

[12] *Id.* at pp. 6-7.

[13] *Id.* at p. 7.

[14] *Id.* at p. 8.

[15] *Id.*

[16] *Id.*

[17] *Id.* at p. 8.

practicing medicine.[18]

Defendants next argue that Dr. Lutz's findings are not outside his field of expertise because although he is not an orthopedist, he can diagnose, evaluate, and render a medical opinion on musculoskeletal/orthopedic conditions and injuries.[19] Defendants aver that Plaintiff's back condition was first diagnosed by a family/general practitioner just like Dr. Lutz.[20] According to Defendants, "[i]f Plaintiff is going to rely on non-orthopedics' diagnoses and opinions to prove his claim; [sic] then he cannot, in good conscience, seek to exclude a similarly specialized physician from rendering an opinion because Plaintiff disagrees with the Doctor's conclusions."[21] Defendants further contend that "Dr. Lutz was required to take orthopedic courses in medical school, that his training to receive his board certification in Internal Medicine was in rheumatology (a musculoskeletal condition), and that a third of his practice involves the diagnosis and treatment of musculoskeletal injuries/conditions."[22]

Finally, Defendants contend that Dr. Lutz's testimony will aid the trier of fact in determining the cause of Plaintiff's current condition, including the impact that his blood pressure and obesity will have on his ability to return to work.[23] Defendants aver that "Plaintiff's obesity and high blood pressure are preventing Plaintiff from recovering from his low-back condition, and will be a major contributor for what will likely be future medical treatment for Plaintiff and explain why Plaintiff

---

[18] *Id.* at p. 9.

[19] *Id.*

[20] *Id.*

[21] *Id.* at p. 10.

[22] *Id.*

[23] *Id.* at p. 11.

may not be able to undergo successful surgery at this time."[24]

### III. Law and Analysis

**A.    Admissibility of Expert Testimony**

A district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702.[25] Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[26] Rule 702 requires that expert testimony (1) be based upon sufficient facts or data, (2) is the product of reliable principles and methods, and (3) applies the principles and methods reliably to the facts of the case. As the Supreme Court held in *Daubert*, Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable."[27]

The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proposed expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence.[28] The reliability inquiry requires the Court to assess whether the reasoning or methodology

---

[24] *Id.* at p. 12.

[25]  *See General Electric Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000) (citations omitted).

[26] Fed. R. Evid. 702; *see also Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[27] *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony).

[28] *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir.1994)).

underlying the expert's testimony is valid.[29] The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.[30]

*Daubert* identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested, (2) whether the theory has been subject to peer review and publication, (3) any evaluation of known rates of error, (4) whether standards and controls exist and have been maintained with respect to the technique, and (5) general acceptance within the scientific community.[31] In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of specific factors does not necessarily nor exclusively apply to every expert in every case.[32] In addition to the five factors laid out in *Daubert,* a trial court may consider other factors, such as (1) whether the expert's opinion is based on incomplete or inaccurate data; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and (3) whether the expert has adequately accounted for alternative explanations.[33] The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[34]

The Court must also determine whether the expert's reasoning or methodology "fits" the

---

[29] *See Daubert*, 509 U.S. at 589.

[30] *See id.* at 590.

[31] *See id.* at 592–94.

[32] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and the application of *Daubert* factors depends on the "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

[33] *See, e.g.*, *Black v. Food Lion Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *Moore*, 151 F.3d at 278–79; *In re Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005) (Fallon, J.).

[34] *Kumho Tire*, 526 U.S. at 152.

facts of the case and whether it will thereby assist the trier of fact to understand the evidence—in other words, whether it is relevant. The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[35]

The Court is cognizant that its role as a gatekeeper does not replace the traditional adversarial system.[36] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[37] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[38]

**B.     *Analysis***

Plaintiff does not question Dr. Lutz's methodology in arriving at the opinions expressed in his report. Rather, he argues that Dr. Lutz is not qualified to testify because "although eminently qualified in certain fields of medicine," Dr. Lutz "is not qualified as either an orthopedist, neurologist, or as a surgeon in either of those specialized fields, his opinion on such conditions would not assist the trier of fact in the determination of this case."[39]

Plaintiff suggests that *Verzwyvelt v. St. Paul Fire & Marine Insurance Co.* is analogous

---

[35] Fed. R. Evid. R. 401.

[36] *See Daubert*, 509 U.S. at 596.

[37] *Id.* (citing *Rock*, 483 U.S. at 61).

[38] *Id.* (quoting *Viterbo*, 826 F.2d at 422).

[39] Rec. Doc. 12-1 at p. 1.

here.[40] In that case, the court found that a coroner, McCormick, was not qualified to testify for the

plaintiffs as to whether a Listeria infection caused the decedent's death because he "concedes that

he has little or no scientific knowledge concerning listeria, listeria infections, or the subfield of

hematopathology. He did not find evidence of listeria in decedent's body at the time of autopsy and

performed no tests related to listeria."[41] The court noted, however, that:

> [I]f the CDC had found evidence of Listeria in tissue samples from the decedent,
> which could have been further tested and examined by other, independent sources;
> or, if [the doctor who tested the tissue samples] had been able to submit a definitive
> diagnosis, which likewise could have been subject to further, scientific validation,
> then the plaintiffs may have been able to establish the requisite, scientific foundation
> under *Daubert* and its progeny. Lacking either, however, McCormick's proposed
> testimony is not sufficiently based in "scientific knowledge" to qualify for legal,
> evidentiary purposes.[42]

The Court finds *Verzwyvelt* distinguishable from the present case. Here, Dr. Lutz has been an

internal medicine physician since 1975, received training in musculoskeletal and orthopedic

conditions, and has submitted to the Court that one third of his practice involves the diagnosis and

treatment of musculoskeletal injuries and conditions.[43]  Dr. Lutz bases his opinions in this case on

the in-person IME that he performed on Plaintiff on March 18, 2014, as well as on the medical

reports of Plaintiff's other treating physicians.[44]

      The Court finds that Plaintiff has failed to demonstrate that the "factual basis, data,

principles, methods, or their application" underlying Dr. Lutz's proposed testimony has been "called

---

[40] *Verzwyvelt v. St. Paul Fire & Marine Ins. Co.*, 175 F. Supp. 2d 881, 884 (W.D. La. 2001).

[41] *Id.* at 886.

[42] *Id.* at 887.

[43] Rec. Doc. 13 at p. 10.

[44] *Id.* at p. 6.

sufficiently into question" under Rule 702.[45] Instead, the Court finds that Dr. Lutz's testimony, as

a whole, has a sufficiently reliable basis in the knowledge and experience of the relevant discipline.[46]

Dr. Lutz's expert testimony will no doubt be subjected to vigorous cross-examination and, perhaps,

the presentation of contrary evidence.[47] Therefore, the Court finds that for the purposes of Rule

702, Dr. Lutz's opinion is admissible.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's "Motion to Exclude Report and Testimony

of Brobston Lutz, MD[48] is **DENIED**.


**NEW ORLEANS, LOUISIANA**, this ___20th___ day of October, 2014.


**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[45] *Kumho Tire Co., Ltd.*, 526 U.S. at 149.

[46] *See id.*

[47] See *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment....").

[48] Rec. Doc. 12.